**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**GWENDOLYN L. SHELTON**                                                      **PLAINTIFF**

**v.**                          **Case No. 5:19-cv-00256-LPR**

**PINE BLUFF/**
**JEFFERSON COUNTY LIBRARY**                                      **DEFENDANT**

## ORDER

On August 8, 2019, *pro se* Plaintiff Gwendolyn Shelton brought this employment action under Title VII of the Civil Rights Act of 1964.[1]  In her Complaint, Ms. Shelton alleges that she suffered race discrimination during her nine-month employment as the Branch Manager at the Altheimer Branch of the Jefferson County Library System (the Library System).[2]  She also alleges a violation of the Equal Pay Act.[3]  Specifically, Ms. Shelton alleges that:

- she was "subjected" to "different terms and conditions of employment because of [her] race, a black female, in violation of Title VII[;]"

- she "was paid less and given less hours but expected to do the same amount of work as other branch managers[;]"

- "[w]hen [she] was hired, [she] was told [she] would receive the same benefits as full-time employees," but in reality "did not receive Holiday Pay or other benefits (other than insurance) that the other Branch Managers received[;]"

- "[a]s Branch Manager of a mainly [b]lack community, [her] budget was also less than Branches that had a majority white population."[4]

---

[1] 42 U.S.C. §§ 2000e *et seq*.  This case was transferred to me when I took the bench in November of 2019.  *See* November 15, 2019 Text Order (Doc. 17).

[2] *See* Complaint (Doc. 2) at 1.  Although Ms. Shelton was granted leave to file an Amended Complaint (Doc. 11), she failed to follow the Court's instructions to perfect that filing.  As a result, the Court deemed the Amended Complaint a legal nullity.  *See* February 27, 2020 Order (Doc. 35) at 1 n.2.

[3] *See* Complaint (Doc. 2) at 2.

[4] *Id*. at 2-3.

The Library System moved for summary judgment on all claims in the Complaint.[5] Ms. Shelton's Response included both substantive points and a request that the Court defer a decision on summary judgment until the completion of discovery.[6]  The Library System filed a Reply.[7]  As requested by Ms. Shelton, the Court deferred a decision on summary judgment until the discovery period closed.[8]  The Court directed that, upon completion of discovery, if the Library System intended to move forward on a motion for summary judgment, it would have to either renew its already-filed motion or file an amended motion.[9]  Discovery concluded on January 8th.[10] The Library System has since renewed its motion for summary judgment and explained that it stands on its original submissions.[11]  The summary judgment motion is now ripe for review. [12]

---

[5] *See* Motion for Summary Judgment (Doc. 20); Statement of Facts (Doc. 21); Brief in Support (Doc. 22).

[6] *See* Shelton's Objection to Motion for Summary Judgment (Doc. 24); Response to Declaration of Tina Blair (Doc. 25); Response to Defendant's Statement of Undisputed Material Facts (Doc. 26); Brief in Support (Doc. 28); Exhibits A-F (Doc. 29).

[7] *See* Response in Support of Summary Judgment (Doc. 30).  Without asking for permission to do so, Ms. Shelton filed a Sur-Reply along with a supporting Affidavit.  *See* Response in Objection & Affidavit (Doc. 31 & 32).  Neither submission complied with the Federal Rules of Civil Procedure.  As a result, the Court ordered that neither of those documents would be considered in reaching a decision on summary judgment.  *See* February 27, 2020 Order (Doc. 35) at 1 n.3.

[8] *See* February 27, 2020 Order (Doc. 35).

[9] *Id*. at 2.

[10] *See* Final Scheduling Order (Doc. 16).

[11] *See* Notice of Renewal of Motion for Summary Judgment (Doc. 38).  The Library System explained that it decided to stand on its prior summary judgment submissions because (1) Ms. Shelton had not amended her complaint, (2) no expert witnesses had been identified, (3) no records had been subpoenaed, and (4) no timely written discovery had been exchanged.  It does appear that, on December 28, 2020, Ms. Shelton issued written discovery to the Library System.  *See* Defendant's Exhibit 1, Request for Production Document (Doc. 38-1).  The Library System did not respond, taking the position that it was too late for discovery because of the impending January 8, 2021 deadline.  *See* Notice of Renewal of Motion for Summary Judgment (Doc. 38) at 2 n.1.  Whether the Library System was correct in that position (or took that position in good faith), Ms. Shelton never moved to compel a response.  The time to do so has long since passed.

[12] Ms. Shelton has filed a document styled Motion to Deny Notice of Renewal of Motion for Summary Judgment. (Doc. 40).  Upon review, it is not a motion at all.  Instead, it is a substantive response to the merits of the original summary judgment motion.  The Library System objects to the submission, arguing that it is untimely and that it seeks to inject new legal and factual matters into the summary judgment record inconsistent with both the Federal Rules of Civil Procedure and the Local Rules of this Court.  *See* Notice of Response in Opposition (Doc. 41) at 2.  The Court

There is some underbrush to clear out in this case.  In her various submissions to the Court opposing summary judgment, Ms. Shelton attempts to expand the scope of her claims.  She raises the specter of, among other things, a hostile work environment,[13] retaliation,[14] unsafe working conditions,[15] and breach of contract/promissory estoppel.[16]  To the extent these are even properly considered "claims," none of them can move forward.  The common flaw is the failure to allege such "claims" in the Complaint.[17]  Some have other flaws too.  Take, for example, the assertions of a hostile work environment and retaliation.  Both require exhaustion.[18]  But Ms. Shelton did not bring such issues to the EEOC, and thus cannot proceed on them in this case.[19]

---

will consider the filing as part of the summary judgment record.  The Court deferred ruling on summary judgment so more information could be gathered during the discovery period.  It is only fair to allow Ms. Shelton to revise her arguments against summary judgment after the close of discovery and as the Court takes up the summary judgment issue once again.  That is what Ms. Shelton's filing does.  With respect to specific issues raised about the propriety and relevance of facts set forth within the document, those issues are essentially moot.  Even fully considering all of the information provided in the document, the Court concludes that summary judgment in favor of the Library System is warranted on all claims.

[13] *See*, *e.g.*, Decl. of Gwendolyn Shelton (Doc. 25) at 16-21, ¶¶20-22.

[14] *See id*. at ¶24.  It is worth noting that the principal purported retaliation Ms. Shelton describes is not retaliation against her.  Ms. Shelton contends the Library System retaliated against the Altheimer Branch after she quit by reducing library hours.  *Id*.  Ms. Shelton obviously cannot pursue a retaliation claim where she was not the object— direct or indirect—of the purported retaliation.

[15] *See id*. at 8-9, ¶7.

[16] *See id*. at 9-10, ¶8.

[17] The wrongful acts now asserted in Ms. Shelton's various motion papers were known to Ms. Shelton at the time she filed her Complaint.  This is not a situation where allegedly wrongful acts only became known subsequently, through discovery or some other mechanism.

[18] *See Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006).

[19] *See* EEOC Charge of Discrimination (Doc. 2) at 5.  The complaint to the EEOC is very narrow.  Ms. Shelton notes that she "was hired on September 3, 2018 as a Branch Manager" and that, "d]uring [the] term of [her] employment," she was "subjected to different terms and conditions of employment . . . ."  Ms. Shelton explained that those different terms of employment included (but were not limited to) "not receiving holiday pay and other benefits," having a branch budget that was "less than other branches receive," being required to perform "the job duties of a full-time Branch Manager," and not being "provided coverage" by the Director "when needed."  Ms. Shelton's EEOC complaint says she was subjected to different terms and conditions of employment "because of [her] race, African American," and that this violates Title VII.

In short, Ms. Shelton has only two live claims here.  The first live claim is that the Library System violated Title VII by "discriminating against" Ms. Shelton "with respect to [her] compensation, terms, conditions, or privileges of employment because of [her] race . . . ."[20]  The second live claim is that the Library System violated the Equal Pay Act, which makes it illegal for an employer to "discriminate . . . between employees on the basis of sex by paying wages to employees" of one sex "at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, responsibility, and which are performed under similar working conditions . . . ."[21]

The Equal Pay Act claim is easily resolved.  It is undisputed that (1) Ms. Shelton is a woman, and (2) the other Branch Managers in the Library System were all women.[22]  The differences in pay or benefits between Ms. Shelton and the other female Branch Managers is not discrimination *on the basis of sex* as that term is used and defined in the Equal Pay Act.[23]  Ms. Shelton does not point to a man who was doing the same or similar work and say he was paid more than her.  Instead, Ms. Shelton argues (without any support in the caselaw) that the Equal Pay Act is violated where a black woman is paid less than white women doing the same or similar work.[24]  Ms. Shelton is wrong.  There's no conceivable Equal Pay Act violation here.  Indeed, the Equal Pay Act is explicit that it does not make illegal unequal pay that is "based on any factor

---

[20] 42 U.S.C. § 2000e-2(a)(1).  Ms. Shelton did not, in her EEOC complaint, say that the discrimination was based on her sex.  Indeed, to the contrary, she expressly confined her EEOC complaint to allegations of racial discrimination. *See* Complaint (Doc. 2) at 2, 5.

[21] 29 U.S.C. § 206(d)(1).

[22] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 5, ¶12; Plaintiff's Response to Statement of Undisputed Material Facts (Doc. 26) at 3, ¶12 (not disputing and thus admitting that the other branch managers were all women).

[23] *See* 29 U.S.C. § 206(d)(1); *see also Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 718-19 (8th Cir. 2000).

[24] *See* Shelton's Objection to Motion for Summary Judgment (Doc 24-1) at 3, ¶2.

other than sex."[25]

Unlike the Equal Pay Act claim, Ms. Shelton's Title VII claim is at least theoretically viable.  The Title VII claim thus requires a somewhat fuller summary judgment analysis.  The standard is a familiar one.  A Court must grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[26] Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[27]  Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment."[28]  The dispute of fact must be both genuine and material to prevent summary judgment.[29]  A genuine dispute of fact exists where a rational jury could decide the particular question of fact for either party.[30]  A material dispute of fact exists where the jury's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[31]

Facts

The Court relies primarily on undisputed facts.  Where there are genuine factual disputes, the Court will accept, for purposes of this motion only, the version of the genuinely disputed fact (and reasonable inferences therefrom) that is most favorable to Ms. Shelton.

---

[25] 29 U.S.C. § 206(d)(1).

[26] *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing FED. R. CIV. P. 56).

[27] *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[28] *Id.*

[29] *Id.*

[30] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[31] *Id.*

The Jefferson County Library System operates its main branch in Pine Bluff with four satellite branches in the surrounding communities of White Hall, Watson Chapel, Redfield, and Altheimer.[32] Each library branch has a Branch Manager.[33] During Ms. Shelton's employment, all of the Branch Managers were female.[34] Ms. Shelton and a second Branch Manager were African American.[35] The other two Branch Managers were Caucasian.[36] The Library System employed Tina Blair as its Operations Manager.[37] Ms. Blair, who is African American, supervised the Library System employees, including the Branch Managers.[38] Ms. Blair was supervised by Barbara Morgan, the Library System Director.[39] The record is silent as to Ms. Morgan's race.

The story gets going in 2018. At that time, the Altheimer Branch had a *full-time* salaried Branch Manager. So did the main branch in Pine Bluff and all the other satellite branches.[40] In

---

[32] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 1, ¶1; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 1, ¶1.

[33] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3 & 5, ¶¶4, 12; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2-3, ¶¶4, 12.

[34] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 5, ¶12; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 3, ¶12 (not disputing and thus admitting that the other Branch Managers were female). Ms. Shelton does not deny that there were no male branch managers, instead challenging only that it is a material fact.

[35] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 5, ¶12; Decl. of Tina Blair (Doc. 20-1) at 4-5, ¶12; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 3, ¶12 (not disputing and thus admitting this portion of paragraph 5 in Defendant's Statement of Undisputed Material Fact).

[36] *See id.*

[37] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶4; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶4.

[38] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶4; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶4; *see also* Decl. of Tina Blair (Doc. 20-1) at 6, ¶19; Plaintiff's Response to Decl. of Tina Blair (Doc. 25) at 6, ¶19.

[39] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶5; Response to Defendant's Statement of Undisputed Material Facts (Doc 26) at 4, ¶15; *see generally* Decl. of Gwendolyn Shelton (Doc. 25) at 9, ¶8 (identifying Bobbie Morgan as the Director).

[40] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶5 & at 5, ¶11; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 3, ¶5 (not disputing and thus admitting this portion of paragraph 5 in Defendant's Statement of Undisputed Material Fact) & at 5, ¶11.

the summer of 2018, the full-time Altheimer Branch Manager left her position.[41]   The open

position was advertised as *part-time* hourly Branch Manager.[42]  Ms. Blair testified by declaration

as to the decision to change the position from full-time to part-time:

> In light of the conclusion of [the former Branch Manager's] employment with the
> System, my supervisor, the Library Director, Ms. Barbara Morgan, and I evaluated
> whether the future branch manager for the Altheimer library branch should be filled
> with another full-time, salaried employee . . . or by a part-time, hourly employee
> who would work between 30 and 40 hours per work week.  Ultimately, the System
> decided that the open branch manager position . . . would be advertised and filled
> as a part-time, hourly position of less than 40 hours per week.  This personnel
> decision for the Altheimer branch was influenced by two factors: (1) the smaller
> circulation statistics, smaller number of patron visitors, and smaller number of
> library program attendees did not warrant the need for a full-time branch manager,
> and (2) potential payroll savings for the System.[43]

Ms. Shelton disputes that the decision was made for the two reasons stated by Ms. Blair.[44]  The

basis of her dispute is not so clear.  As best the Court can tell, Ms. Shelton is disputing that

Altheimer had comparatively lower circulation statistics, patron visitors, and program attendees in

the summer of 2018.  But she provides no support for this proposition.  The library statistics charts

(of unknown origin)[45] that she points to don't help her.  To the extent they address circulation,

patron visitors, and program attendees ***during or prior to*** the summer of 2018 (when the decision

---

[41] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶5; Decl. of Tina Blair (Doc. 20-1) at 3, ¶7; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶5 (not disputing and thus admitting this portion of paragraph 5 in Defendant's Statement of Undisputed Material Fact).

[42] *See* Decl. of Tina Blair (Doc. 20-1) at 3, ¶7; Library System's Advertised Position (Doc. 20-1) at 30; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶6; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶6.

[43] Decl. of Tina Blair (Doc. 20-1) at 3, ¶7; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶5.

[44] *See* Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶5.

[45] The Court agrees with the Library System's argument that Plaintiff's Exhibits 9-14 and 59-60 lack the necessary authentication and are therefore inadmissible under FED. EVID. R. 901.  *See* Exhibits A-F (Doc. 29) at 33-55.  The Court discusses them in this Order only to show that, even if those Exhibits were admissible, they would not make a difference to the outcome of this Motion.

to make the position part-time was taken), they are consistent with Ms. Blair's testimony.[46]

Although the open Branch Manager position was going to be a part-time position, it came with some benefits (unlike other part-time positions).  Ms. Blair explains in her declaration why this choice was made:

> [B]ecause of the remoteness of the Altheimer branch and to hopefully help with employee retention for the part-time, branch manager position, it was also decided by the System that the position would include health and dental benefits, which would be an exception to the normal 'no benefits' guideline for part-time employees described in page 10 of the Employee Manual . . . This sort of change to the standard, 'no-benefits' guideline for part-time employees is a change that is permissible, as noted on page 1 of the Employee Manual."[47]

It is worthwhile remembering that all of these decisions (part-time versus full-time, benefits, etc.) were made before the open job was even advertised.  To be clear:  no one had applied for or was under consideration for the job when these decisions were made.

Subsequently, the position was publicly advertised.[48]  The advertisement stated clearly that the "job-type" was "part-time," although the advertisement did note—in terms of

---

[46] One quick, non-exhaustive example should suffice.  Consider Exhibit 9 of Plaintiff's Exhibits A-F (Doc. 29) at 33.  Perhaps Ms. Shelton believes this exhibit helps her case because it shows that Altheimer had 1,708 check-outs in October of 2018 and Redfield only had 1,659.  However, comparative circulation in October of 2018—which was well after the summertime decision to make the Branch Manager position part-time—is irrelevant.  To the extent any figures on this chart are relevant, it is the October 2017 figures, which show Altheimer check-outs at 110 and Redfield check-outs at 2,055.  Indeed, Ms. Shelton herself notes that the "statistics dramatically improved" *after* she was hired and began work.  *See* Decl. of Gwendolyn Shelton (Doc. 25) at 8, ¶5.

Ms. Shelton does note that, once she got on board in October of 2018, she determined that some of the Altheimer Branch statistics were inaccurate—meaning lower than reality.  *Id.* at 11-14, ¶¶10-15.  But she does not say that Ms. Blair or Ms. Morgan knew in the summer of 2018 that the statistics were inaccurately low.  Quite to the contrary, Ms. Shelton acknowledges in her declaration that "during [the] interview process, the Director stated to me that the statistics for the Altheimer library were very low and that part of my job was to raise the statistics."  *Id.* at 11, ¶10.

[47] Decl. of Tina Blair (Doc. 20-1) at 3-4, ¶7; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 4, ¶8; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶8 (not disputing and thus admitting this portion of paragraph 8 in Defendant's Statement of Undisputed Material Fact).  The relevant portions of the Employee manual appear at Doc. 20-1 at 17-27 and are consistent with Ms. Blair's testimony.

[48] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 4,  ¶6; Decl. of Tina Blair (Doc. 20-1) at 4, ¶8; Library System's Advertised Position (Doc. 20-1) at 28-30.

qualifications—that the person selected must "meet the requirements of Full-Time staff outlined in the Library's Staff Manual."[49]  The advertisement stated that the "salary range" was "$19,334 per year or $12 hr."[50]  $12 per hour x 31 hours per weeks x 52 weeks in a year equals $19,334. This tracks the undisputed record evidence that the Library System set the job hours at an average of 31 hours per week of work.[51]

Thirteen candidates applied for the job.[52]  There is no record evidence as to the demographic breakdown of the applicant pool.  Ms. Morgan, Ms. Blair, and Jeannie West conducted interviews and ultimately chose Ms. Shelton for the position.[53]  Ms. Shelton accepted the job on September 3, 2018.[54]  She worked the job for about 9 months.  Ms. Shelton submitted

---

[49] Library System's Advertised Position (Doc. 20-1) at 29-30.

[50] *Id.*  Ms. Shelton does not dispute that this was the advertisement she saw and to which she responded.  Moreover, at her interview for the Branch Manager position, Ms. Shelton provided the Library System a "portfolio," which included this specific job advertisement.  *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 7, ¶20; *see also* Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 4, ¶20.

[51] *See* Plaintiff's Response to Second Set of Request for Admissions (Doc. 20-3) at 2; *see also* Shelton's Objection to Motion for Summary Judgment (Doc. 24) at 2 (Ms. Shelton states she knew she would only receive 31 hours per week.).  It is a little unclear from the record whether Ms. Shelton was scheduled for 31 hours each week or 30 hours some weeks and 32 hours other weeks.  (*Id.* at 11).  Ms. Shelton argues she was told during the interview that the position was for 31 hours per week, not 30 hours one week and 32 hours the next.  *See* Decl. of Gwendolyn Shelton (Doc. 25) at 9, ¶8 ("I expressly asked about the benefits during the interview process because of the odd 31 hours and was told by the Director that the hired employee had to work the 31 hours in a week in order to receive the benefits. The individual could not work 30 hours one week and 32 hours in the other week.").

[52] *See* Defendant's Statement of Undisputed Fact (Doc. 21) at 4, ¶7; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶7.

[53] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 4, ¶7; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶7.  While the Defendant does not identify Ms. West's position, it is clear that Ms. West was the Library System's Human Resources Manager.  *See* Shelton's EEOC Dismissal and Notice of Rights (Doc. 2) at 4; *see also* Decl. of Gwendolyn Shelton (Doc. 25) at 9, ¶8; & Doc. 29 at 7.  The record is silent as to Ms. West's race.

[54] *See* Plaintiff's Response to Second Set of Requests for Admissions (Doc. 20-3) at 1-2; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 4, ¶9; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶9.  *See also* Doc. 20-2 at 9-11 (signing of various HR intake forms and acknowledgements on Sept. 6, 2018).

a letter of recognition on June 7, 2019.[55]  Her last day of employment was June 22, 2019.[56]

Ms. Shelton acknowledges that the job for which she applied and was selected was advertised as a part-time, hourly position.[57]  She does not claim that she ever worked a full-time schedule.[58]  The Library System tracked Ms. Shelton's hours (as it did for all other part-time employees) through its Paychex Flex system.[59]

As to benefits, Ms. Shelton states as follows:

I received life and health insurance [benefits] immediately upon accepting the branch manager position.  I received sick and vacation leave after my introductory period ended but never received Holiday pay.  I only accepted the library branch manager position . . . because the Director Bobbie Morgan stated during the interview that [I] would receive benefits which the Director believed to include holiday pay.  I would not have accepted the job without the promise of holiday pay because I was making approximately two thousand dollars a year more working 40 hours at Allied Universal as Shift Supervisor and was eligible for health benefits but holiday pay was only available at time and a half if an employee worked a paid holiday. . . .  I expressly asked about the benefits during the interview process because of the odd 31 hours and was told by the Director that the hired employee had to work the 31 hours in a week in order to receive the benefits.  The individual could not work 30 hours one week and 32 hours in the other week.  In a conversation that I had with Jeannie West, I inquired about holiday pay and was told by Jeannie West that they were working on it.  If this was not part of the package, why were they working on it.  When I spoke to the Director [Ms. Morgan] by phone and told her that I was not getting my holiday pay, the Director told me that I was supposed

[55] See Shelton's Letter of Resignation (Doc. 20-2) at 12; see also Plaintiff's Response to Second Set of Requests for Admissions (Doc. 20-3) at 2; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 8, ¶26; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 6, ¶26.

[56] See Plaintiff's Response to Second Set of Requests for Admissions (Doc. 20-3) at 3; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 9, ¶27; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 6, ¶27.

[57] See Defendant's Statement of Undisputed Material Fact (Doc. 21) at 4-5, ¶¶6-11; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2-3, ¶¶6-11.

[58] See Defendant's Statement of Undisputed Material Fact (Doc. 21) at 6, ¶15; Response to Defendant's Statement of Undisputed Material Facts (Doc 26) at 4, ¶16.  See generally Decl. of Gwendolyn Shelton (Doc 25).

[59] See Defendant's Statement of Undisputed Material Fact (Doc. 21) at 6, ¶15; Decl. of Tina Blair (Doc. 20-1) at 5-6; Plaintiff's Response to Second Set of Requests for Admissions (Doc. 20-3) at 2. Ms. Shelton contests the Library System's assertion that she was a "regular" part-time employee.  See Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 4, ¶15.  But she does not contest that she generally worked 31 hours each week, and did not work a full-time schedule.  See Footnote 51, supra.

> to be getting holiday pay.  I then made a visit to the Main Library a few days later
> to speak with Jeannie West in Human Resources about my holiday pay and the
> conversation I had with the Director.  Jeannie West said she was in the same board
> meeting and the Board had not approved it but maybe she missed hearing that.
> Jeannie West then walked with me to the Director's office to discuss the holiday
> pay issue and the Director exclaimed 'Ooops. I misspoke.'. . . .[60]

Ms. Shelton does not allege (let alone provide evidence) that the post-contracting decision not to provide holiday pay was taken because of her race.  The picture painted by the facts—even when taken in the light most favorable to Ms. Shelton—suggests either a miscommunication by the contracting parties as to the meaning of holiday pay[61] or an erroneous representation about holiday pay made by Ms. Morgan at the interview.[62]

Ms. Shelton occupied the only part-time branch manager position in the Library System.[63] Ms. Shelton's position was somewhat unique in the Library System; she received more benefits than other part-time employees.[64]  In contrast to every other part-time employee in the Library System, Ms. Shelton was the only one who was provided health and dental benefits.[65]  And, in her short nine months with the Library System, she was given a pay raise.[66]  There is no record

---

[60] Decl. of Gwendolyn Shelton (Doc. 25) at 9-10, ¶8.

[61] It may be that Ms. Shelton was inquiring about pay for holidays even where no work is performed, while Ms. Blair was answering about time and a half pay if work is needed on holidays.  *See, e.g.*, Defendant's Statement of Undisputed Material Fact (Doc 21) at 6-7, ¶16.

[62] Relying on the legal theory of promissory estoppel and her own Declaration, Ms. Shelton asserts that she, in fact, was entitled to the same benefits of a full-time Branch Manager, asserting she was promised holiday pay. *See* Decl. of Gwendolyn Shelton (Doc. 25) at 9-10, ¶¶8-9; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 4, ¶18.

[63] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 5, ¶11; 20-1 at 5, ¶14; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 3, ¶11.

[64] *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 3, ¶5; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶5 (not disputing and thus admitting this portion of paragraph 5 in Defendant's Statement of Undisputed Material Fact).

[65] *See id*.

[66] Defendant's Statement of Undisputed Material Fact (Doc. 21) at 6 n.1; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) (Ms. Shelton does not dispute and thus admits she received a raise.).

evidence as to the salary earned by the full-time branch managers.  I do know they were "salaried employees" as opposed to "hourly employees."[67]  And it is fair to assume that their salaries were higher than the yearly equivalent of Ms. Shelton's hourly wages, even after she received a 50 cent per hour raise on January 1, 2019.[68]  Ms. Shelton's ultimate objection is being compensated less than the salaried Branch Managers, whether it was because of differences in base pay or because Ms. Shelton did not get paid for holidays when the library was closed and she was not asked to work.  In short, she says she did the same work as the other Branch Managers and the differential pay treatment amounts to racial discrimination in violation of Title VII.

A Branch Manager has "the responsibility to plan and implement library programming for their branch and to oversee those subordinates who worked to carry out the manager's plans for the branch and its day-to-day operations."[69]  In general, the job of a Branch Manager entails overseeing the branch's reference, circulation, processing, cleanliness, and orderliness as well as supervision of its employees.[70]  If one compares the advertisement for a part-time Branch Manager to the job description of a full-time Branch Manager, one will note several slight differences.  For example, the full time position requires that the branch's calendar of public events and social media to be regularly updated whereas the part-time position is silent as to this issue.  In any event, the two positions appear to be very close in terms of job duties.[71]  One notable difference between the

---

[67] Decl. of Tina Blair (Doc. 20-1) at 4-5, ¶12.

[68] After the raise, her pay was $12.50 per hour or $20,150 per year.  *See* Defendant's Statement of Undisputed Material Fact (Doc. 21) at 6 n.1.

[69] Decl. of Tina Blair (Doc. 20-1) at 5, ¶5; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 6, ¶14. *See also* Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 3, ¶14 (Ms. Shelton says that, in a Branch Manager's absence, the Assistant Branch Manager can step in and perform these tasks).

[70] *See* Library System's Advertised Position (Doc. 20-1) at 28.

[71] The record contains the Library System's part-time Branch Manager advertisement, a part-time Branch Manager job description that Ms. Shelton says comes from the internal Library System staff website, and a full-time Branch

positions, however, is the anticipated and actual scope and effort of the work involved.  As previously discussed, because of the statistics examined, the Library System anticipated that whoever got the Altheimer Branch Manager job would be able to complete the work required in 31-hours per week.[72]  This proved accurate; Ms. Shelton was able to complete her duties in 31 hours each week.[73]  In contrast, based on the aforementioned statistics and characteristics of the other satellite branches, the Library System believed that other Branch Manager positions were jobs of larger scope that required having Branch Managers who worked 40 hours or more per week.[74]

In addition to the pay disparity, Ms. Shelton also claims Title VII discrimination with respect to the differing budgets allotted to the branches.  In 2019, the "main operational expenses" budget for the Altheimer branch was $8,648, the budget for the Redfield branch was $11,800, the budget for the Watson Chapel branch was $23,300, and the budget for the White Hall Branch was $40,700.[75]  These budgets covered things like "books, audiovisual, and programming" as opposed

---

Manager job description that Ms. Shelton says comes from the internal Library System staff website.  Let's overlook for a second the authentication problems with the documents submitted by Ms. Shelton.  The advertised part-time Branch Manager position's job duties and qualifications (Doc. 20-1 at 28-30) are identical to the full-time Branch Manager position's job-description.  (Doc. 29 at 85-88).  The part-time Branch Manager's job description (Doc. 29 at 91-92) from the internal website does not have as extensive a job description as the actual part-time position advertisement, but does state that "[t]he part-time Branch Manager shall perform any other work or duties as is necessary for the general operation of the Branch library, or for the operation of the Library System in general."

[72] *See supra* at 7 & 9 n.51.

[73] *See id*; Defendant's Statement of Undisputed Material Facts (Doc. 21) at 6 n.1; *see also* Decl. of Tina Blair (Doc. 20-1) at 6, ¶17.  Neither party asserts that Ms. Shelton ever required overtime to meet the job's demands.  Further, it is clear that Ms. Shelton was meeting and exceeding the job's requirements as she was never discipline or reprimanded and, in fact, was given a raise during her tenure.

[74] *See* Decl. of Tine Blair (Doc. 20-1) at 1-4, ¶¶4-5, 12; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 2, ¶5 (not disputing and thus admitting this portions of these paragraphs in Defendant's Statement of Undisputed Material Fact).

[75] Decl. of Tina Blair (Doc 20-1) at 2-3, ¶ 5.

to salaries.[76]  The record does not include the budget for the Main Library in Pine Bluff.  The record also does not include any indication as to when (month and year) the 2019 budgets were set and approved.

The Library System appears to justify the smaller operational budget for Altheimer by various statistics.  Ms. Blair states in her Declaration that "[a]t all times in 2018 and 2019, the System's smallest (in terms of circulation statistics, number of patrons, and program attendees) library branch has been in Altheimer, Arkansas, which is located in a more sparsely populated part of Jefferson County."[77]  Ms. Blair provides a chart of the monthly circulation statistics for each branch from September 2018 to May of 2019, which shows significantly less circulation of books in the Altheimer branch compared to the other branches.[78]

Ms. Shelton disputes this testimony in several ways.  First, Ms. Shelton says that she has provided library circulation statistics to show that Redfield had fewer patron visitors or program attendees in several of the months at issue.[79]  (As the Court noted above, *see supra* note 45, the documents provided by Ms. Shelton lack any authentication and thus would be inadmissible.)  Second, Ms. Shelton says that the circulation statistics are inaccurately low for the Altheimer branch because of how the numbers were tracked.[80]  Third, Ms. Shelton argues that "even if the [circulation] totals submitted were accurate, they have a disparate impact on funding of branch

---

[76] *Id.*  Given that the Altheimer budget was $8,648, it is obvious that the budget does not include Ms. Shelton's salary.

[77] Decl. of Tina Blair (Doc. 20-1) at 1, ¶3; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 1-2, ¶2.

[78] *Id.* at 2, ¶4; Defendant's Statement of Undisputed Material Fact (Doc. 21) at 2, ¶2.

[79] *See* Response to Declaration of Tina Blair (Doc. 25) at 1, ¶4; Decl. of Gwendolyn Shelton (Doc. 25) at 11-14, ¶¶10-14; Response to Defendant's Statement of Undisputed Material Facts (Doc. 26) at 1, ¶2; .

[80] *See id.*

libraries with majority black population and pay and benefits of these branches."[81]

One other set of facts is worth noting.  Ms. Blair, who managed Ms. Shelton, ends her declaration as follows:

> I am an African-American female.  I am sensitive to and work to guard against any racial or gender discrimination occurring at the System.  Neither Plaintiff Shelton's race, color characteristics, nor her gender was a factor and played no role in why Plaintiff was hired as the part-time branch manager of the Altheimer library branch, as compared to being hired as a full-time, salaried branch Manager of the Altheimer library branch.  The part-time, hourly position that Plaintiff Shelton applied for, interviewed for, and was hired to perform was advertised and open to all interested applicants, regardless of their race, color characteristics, or gender, and it was never advertised as being a full-time, salaried library branch manager position.  Likewise, neither Plaintiff Shelton's race, color characteristics, nor her gender was a factor and played no role in why Plaintiff worked on a part-time basis instead of a full-time basis, was paid the hourly rate she was paid, or received the benefits she received while employed as the part-time branch manager of the Altheimer library branch.  It is my firm belief that the System never discriminated against Plaintiff Shelton on the basis of her race or color characteristics and never paid her less than a male performing equal work requiring equal skill, effort and responsibility which were performed under similar working conditions.[82]

In response, Ms. Shelton expressly rejects the notion that Ms. Blair "is sensitive to and works to guard against racial or gender discrimination occurring at the System."[83]  Ms. Shelton states that "Tina Blair is the 'token' black person and her actions and inactions could be considered as helping the Defendant in discriminating any other blacks."[84]  Ms. Shelton states that several members of the Library Board are members of the Daughters of the Confederacy and the Order of the Eastern Star.[85]

---

[81] Response to Declaration of Tina Blair (Doc. 25) at 1, ¶4.

[82] Decl. of Tina Blair (Doc. 20-1) at 6-7, ¶19.

[83] Response to Declaration of Tina Blair (Doc. 25) at 6, ¶19.

[84] *Id.*

[85] Complaint (Doc. 2) at 3.

Analysis

Ms. Shelton alleges two types of employment discrimination that she believes amount to violations of Title VII.  First, she claims she was compensated less than other branch managers because of her race.  Second, she claims that the budget for the Altheimer branch was unjustifiably less than the budget for the Redfield branch.  Because her EEOC complaint was limited to *racial* discrimination, so are her Title VII claims in this lawsuit.[86]

Let's start with the compensation claim.  Title VII makes it illegal for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment . . . because of such individual's race . . . ."[87]  The most basic problem for Ms. Shelton is that there is no evidence whatsoever that the compensation package had anything to do with Ms. Shelton's race.  All of the evidence confirms that the compensation package was set before the position was advertised.  There is no evidence that the Library System or any agent of the Library System knew, believed, or intended that the open position would be occupied by, or was likely to be occupied by, a person of a specific race.  Indeed, to the extent there was a change in compensation that occurred after the Library System selected a candidate, it was that Ms. Shelton was given a raise after three months on the job.

---

[86] A Title VII plaintiff must exhaust administrative remedies before bringing a discrimination claim in federal court. *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 949 (8th Cir. 2011).  Exhaustion requires notice of all claims of discrimination be given to an employer at the initial administrative charge.  *Stuart v. General Motors Corp.*, 217 F.3d 621, 630–31 (8th Cir. 2000); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–15 (2002) (holding that to state a claim under Title VII, a plaintiff must provide fair notice of the claim and the grounds upon which it rests).  In *Fort Bend County, TX v. Davis*, 139 S. Ct. 1843, 1849 (2019), the Supreme Court addressed Title VII exhaustion and found that it is subject to forfeiture or waiver if not timely raised.  *Fort Bend* stands for the proposition that even a non-jurisdictional mandatory claim processing rule must be enforced "if a party 'properly raises it.'"  *Id.*  The EEOC did not consider nor make a determination as to whether Ms. Shelton was subject to a hostile work environment or retaliation.

[87] 42 U.S.C. § 2000e-2(a)(1).

16

Ms. Shelton has provided no direct evidence that any compensation differential was based on Ms. Shelton's race—either at the time of hiring or thereafter.   Accordingly, if there is any theoretical basis at all on which Ms. Shelton could defeat summary judgment and ultimately prove her claim, it must be using the *McDonnell-Douglas* test.

To make out a *prima facie* case on this claim, Ms. Shelton must show that her compensation (pay and other benefits) was less than one or more similarly situated employees of a different race. Ms. Shelton points to the Branch Managers of the other three satellite branches, who indeed received more favorable compensation than her.   In order to avoid summary judgment, however, Ms. Shelton needed to provide evidence that could permit a rational juror to conclude the other three Branch Managers in fact were similarly situated to Ms. Shelton.   Specifically, Ms. Shelton needed to introduce some evidence that the other Branch Managers performed "equal work" on jobs that required "equal skill, effort, and responsibility . . . [and] under similar working conditions."[88]

The fatal flaw for Ms. Shelton is that the position for which she applied and was selected was a part-time, hourly position.   The Branch Managers at the other branches had applied to and were selected for full-time, salaried positions.   Ms. Shelton argues that she was responsible for the same duties as they were.   Maybe so.   But there is no evidence she ever worked more than a part-time schedule of 31 hours per week.   And there is no evidence suggesting the other Branch Managers worked less than a full-time schedule of 40 hours per week.   All the evidence indicated that Ms. Shelton could accomplish her job in the allotted 31 hours.   Even assuming the skill level and duties were similar for all the Branch Managers, the difference in hours (and thus required effort) means that Ms. Shelton was not similarly situated to the full-time salaried Branch

---

[88] *Tademe v. St. Cloud State Univ.*, 328 F.3d 982, 989 (8th Cir. 2003).

Managers.  No rational juror could conclude that Ms. Shelton can make out a *prima facie* case.[89]

Even if the Court is incorrect about the *prima facie* case, summary judgment is still appropriate.  Once a *prima facie* case is established, a rebuttable presumption of discrimination arises, and the burden then shifts to the employer to articulate a legitimate nondiscriminatory business reason for its actions.[90]  When such a reason is produced, "the presumption disappears and the [plaintiff] bears the burden of proving that the proffered reason was pretextual and the real reason for the [adverse employment action] was discrimination."[91]  The Library System explained that its decision to hire a part-time, hourly Altheimer Branch Manager (instead of a full-time, salaried Branch Manager) was based on legitimate non-discriminatory factors such as circulation statistics, visitor numbers, program attendee numbers, size of the branch, and the need for cost savings.[92]  Accordingly, to survive summary judgment, Ms. Shelton would need to provide enough evidence to permit a rational juror to conclude that the articulated business reasons were in fact a pretext for racial discrimination.

Ms. Shelton has failed to provide any such evidence.  *First*, as detailed in the Facts section, *see supra at* 7–8 and nn. 46 and 47, Ms. Shelton's protestations that the statistics informing the Library System's summer 2018 decision were "inaccurate" or "manipulated" are not supported by

---

[89] In her Motion to Deny Renewal of Motion for Summary Judgment (Doc. 40), Ms. Shelton argues that "according to the Internal Revenue Code § 4890 and the Affordable Care Act § 5314," she is "considered a full-time employee" because she worked over 30 hours each week.  (*Id.* at 2).  The Court understands her argument as an attempt to counter the Library System's argument that she is not similarly situated to other Branch Managers.  Ms. Shelton's argument is a red herring.  The fact that Ms. Shelton's 31-hour work-week is "considered" full-time employment for the specific purposes of the ACA (and IRS regulations implementing the ACA) does not change the fact that her position was qualitatively different from a salaried full-time Branch-Manager who was paid for and expected to work a full 40 hours (if not more) every week.

[90] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[91] *Thomas v. First Nat'l Bank*, 111 F.3d 64, 66 (8th Cir. 1997).

[92] *See* Library System's Brief in Support of Summary Judgment (Doc. 22) at 7; Decl. of Tina Blair (Doc. 20-1) at 1-4.

any actual, admissible evidence. *Second*, even bypassing this insurmountable hurdle, another evidentiary problem exists. There is no evidence whatsoever that Ms. Blair and Ms. Morgan—the supervisors making the decision—intentionally used incorrect statistics, much less did so to legitimize an illegitimate decision. *Third*, there is absolutely no evidence that Ms. Blair or Ms. Morgan knew, believed, intended, or suspected that the part-time position would be filled by a person of a particular race. In such circumstances, how could the reasons articulated for the part-time position be a pretext for discrimination against Ms. Shelton because of her race? They can't be. No rational juror could conclude otherwise. So, summary judgment is appropriate as to the compensation claim.

Ms. Shelton's second Title VII claim focuses on the disparate budgets of each satellite library branch. To the extent Ms. Shelton's claim is that the disparate budgets affected her salary and holiday pay, the Court has already addressed that claim above. Moreover, the Court reiterates that the evidence suggests the budget numbers provided are operational budgets, excluding salary and other compensation figures. To the extent Ms. Shelton's claim is that the low operational budget itself constituted Title VII discrimination (aside from any relationship to Ms. Shelton's compensation), there are at least two problems with her claim. *First*, as a matter of law, it may well be the case that the operational budget for the Altheimer library is not a "term," "condition," or "privilege" of Ms. Shelton's employment. *Second*, there is no evidence that the size of the Altheimer branch budget was altered after Ms. Shelton took the job. Accordingly, there is no evidence that the employer used the size of the budget to discriminate against Ms. Shelton in her role as the Branch Manager. Ms. Shelton cannot use Title VII to try and advance claims on behalf of other employees or the Altheimer community.

Ms. Shelton does not seriously allege disparate treatment with respect to the budget

differentials.  What she really contends is that the circulation statistics used to determine each branch's budget had a disparate impact on communities like Altheimer which has a primarily black population.[93]  This is a disparate impact claim.[94]  But even with a disparate impact claim she must allege individualized employment discrimination.  Ms. Shelton would need some evidence that the Library System has an employment practice that operates to exclude African Americans or otherwise discriminate against them in the terms and conditions of employment.[95]  For all the reasons explained above, there is no such evidence in this case.  No rational juror could find disparate impact actionable under Title VII in this case.  Summary judgment is therefore appropriate on this claim as well.

Conclusion

The Library System's Motions for Summary Judgment (Doc. 20 & 38) are granted. Judgment shall be entered in favor of the Defendant.[96]

Dated, this 24th day of March, 2021.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[93] *See* Shelton's Response to Motion for Summary Judgment  (Doc. 24) at 20-21, 24.

[94] The Civil Rights Act was amended in 1991 to codify a prohibition on disparate-impact discrimination.

[95] *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i).

[96] It appears that Ms. Shelton's recent Motion in Limine and Request for Judicial Notice (Doc. 43) requests relief solely for purposes of trial.  If that is true, the Motion in its entirety is moot and therefore denied.  However, it may be that Ms. Shelton is seeking to have the Court take judicial notice of certain laws and facts for the purpose of resolution of the pending summary judgment motions.  To the extent this is true, her request is live but still denied. Denial is justified based on the untimeliness of the Motion alone, as Ms. Shelton did not file the judicial notice request until nearly two months after the Defendant revived its summary judgment motion.  Moreover, judicial notice is not appropriate here.  The Court need not take judicial notice of the existence and content of IRS Code and the ACA.  The Code and the law are what they are, and the Court can look at them without taking judicial notice of them.  The number of hours per week Ms. Shelton worked (31) is not disputed, and the Court has already considered that fact in its Summary Judgment decision.  There is thus no need to take judicial notice of the number of hours that Ms. Shelton worked per week.  Whether the number of hours worked makes Ms. Shelton a full-time employee, given the IRS Code and ACA sections that she cites, is not an adjudicative fact, let alone an adjudicative fact that meets the test for taking judicial notice.